# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| WILLIAM E. WESO,<br><br>        Petitioner,<br><br>v.<br><br>WILLIAM POLLARD,<br><br>        Respondent. | Case No. 14-CV-888-JPS<br><br>ORDER |

The petitioner alleges that there is newly discovered evidence in his underlying criminal case that would undermine his conviction. (*See* Docket #1). However, he did not provide very clear information about the nature of that evidence or how he had recently obtained it. Thus, in screening his petition, the Court ordered that the petitioner provide additional information about the newly discovered evidence. (Docket #7). The petitioner filed a statement in response.

Because the Court was awaiting that further information, it has not yet screened the petition. The Court will now screen the petition, after providing some detailed information about the new evidence in the petitioner's underlying criminal case.

1.  BACKGROUND

  1.1 Underlying Facts

In August of 1999, the petitioner and his brother were at their mother's house and, for reasons unclear, decided to shoot guns that they had in their possession. *State v. Weso*, 2002 WI App 292, ¶ 2, 654 N.W.2d 94, 258

Wis. 2d 982 (unpublished disposition).[1] A neighbor called the police several times. *Id.* In her third call to the police, she stated that she had just spoken by phone to the petitioner, who told her that he was going to wait on his porch with the guns and shoot at the police if necessary. *Id.*

Two deputies were dispatched to the scene after the neighbor's first call. *Id.* at ¶ 3. After arriving in the area, the deputies stopped a short distance away from the house to determine whether they heard gunshots. *Id.* Indeed, they did, so they drove to the house. *Id.* In that process, they heard another shot and called for backup. *Id.* Two backup officers were dispatched.[2] *Id.* at ¶ 4. Upon the backup officers' arrival at the scene, the police used a public address system to speak to the house's inhabitants and get them to leave the house. *Id.*

One of the first-on-scene deputies moved to the back of the house, where he heard a window open. *Id.* at ¶ 5. Three people exited that window and were walking towards the deputy, who observed that all three were carrying weapons. *Id.*

The deputy announced his position and ordered the individuals to drop their guns; the individuals did not comply, and one fired at the deputy. *Id.* at ¶ 6. The deputy fired back, and the group divided: one individual ran to the left and the two others ran to the right.

---

[1]This citation is to the Wisconsin Court of Appeals' decision on the petitioner's direct appeal. The Court understands that the petitioner asserts that the factual predicate presented against him at trial was later undermined by the new evidence; nonetheless, the Court of Appeals' decision provides the most succinct factual statement. The Court, therefore, uses the Court of Appeals' decision as its starting point.

[2]Around this same time, the neighbor was making her third emergency call, reporting that the petitioner had threatened to shoot at police; the dispatcher reported this information to the police. *Id.* at ¶ 4.

The two individuals who had run to the right apparently continued to fire shots because the deputy heard additional shots, and the remaining officers testified to being fired upon by a pair of individuals. *Id.* at ¶ 7. The remaining officers returned fire, and one used his flashlight to illuminate the scene. *Id.* That officer later identified the petitioner as having run towards the officers with a gun, causing the petitioner to run towards the woods. *Id.*

Meanwhile, the deputy who had first seen the individuals exiting the window at the back of the house, observed the two individuals who were firing on the officers near a stand of woods. *Id.* at ¶ 6. One of those individuals was aiming his gun at the remaining police officers. *Id.* The deputy shot and hit that individual, causing the individual to fall to the ground. *Id.* The remaining individual then bent down and picked up a "long item"—presumably a gun—from the individual who had been shot then ran off. *Id.* The individual who was shot turned out to be Alvin, the petitioner's brother. *Id.* at ¶¶ 6, 8.

The petitioner, himself, was eventually found hiding deeper in the woods. *Id.* at ¶ 8. He did not have a gun on him, but was in possession of shotgun shells. *Id.* The police also located two shotguns in the woods. *Id.* They did not find the third person who had exited the house.

1.2     Petitioner's Trial and Appeal

On August 30, 1999, the petitioner was charged with, among other things, three counts of attempted first-degree homicide, as party to a crime. *Id.* at ¶ 9.[3] A jury trial was held in May of 2000, at which the jury convicted him of those three counts. *Id.*

---

[3]Where specific dates were unclear from the petition or cited cases, the Court was able to access the Wisconsin Court System's public records database. That database includes the dates of relevant case activity.

He appealed his conviction, arguing that the evidence against him was insufficient to sustain his conviction, *id.* at ¶¶ 10–19, and that the trial court failed to conduct a *Miranda-Goodchild* hearing outside the presence of the jury, *id.* at ¶ 20–26.

The Wisconsin Court of Appeals affirmed his conviction. Specifically, as to the sufficiency of the evidence,[4] it determined that, while the precise sequence of events that had occurred was difficult to establish, there was ample circumstantial evidence to support the petitioner's guilt on the counts of attempted first-degree homicide, as party to a crime. *Id.* at ¶ 17. The Wisconsin Court of Appeals stated that various inferences were "sufficient to support the finding that even if [the petitioner] was not the primary shooter, he aided at least Alvin in an attempt to kill," the officers who had not traveled to the back of the house. *Id.* Moreover, the inference also were "sufficient to support a verdict on the grounds of aiding and abetting the attempt to kill justice even if [the petitioner] had not been the principal in that attempt." *Id.* The Wisconsin Court of Appeals went on to find that—even if the petitioner had not fired a single shot—the jury could easily have determined that the petitioner engaged in a conspiracy to attempt murder. *Id.* at ¶ 18. The Wisconsin Court of Appeals concluded:

> In any event, the evidence show[ed] that all three people were acting together at the time of the shootings…. Given this and all the other evidence, a reasonable jury could have inferred the three people were working together under a master plan as conspirators, making it irrelevant whether [the petitioner] actually fired any shots.

*Id.* at ¶ 19.

---

[4]The *Miranda-Goodchild* issue is of limited relevance to the petition in this case, so the Court does not address it.

The petitioner filed a petition for review in the Wisconsin Supreme Court, which was denied on January 14, 2003. *State v. Weso*, 2003 WI 16, 657 N.W.2d 707, 259 Wis. 2d 101. The petitioner did not file a petition for a writ of certiorari in the United States Supreme Court.

1.3     Trial and Conviction of Co-Conspirator

The primary reason for the petitioner's current petition before the Court stems from the trial and conviction of Robert Jacobson ("Jacobson"), who was the third individual present—aside from the petitioner and his brother—on the night of the shooting incident.

In November of 2000—after the petitioner's jury trial, but before completion of his direct appeal—the State of Wisconsin filed criminal charges against Jacobson. *See State v. Jacobson*, 2004 WI App 125, ¶ 1, 683 N.W.2d 93, 275 Wis. 2d 276. In the interim, the petitioner's brother had altered his account of events, stating that Jacobson had been the third individual present the night of the incident. *Id.* at ¶ 7.

A jury trial was held in July of 2001, and the jury returned a verdict against Jacobson finding him guilty of attempted first degree homicide (*not* as party to a crime). *See id.* at ¶ 1. It is not clear whether the State presented Jacobson as being one of the two individuals who ran towards the forest and fired upon police, but the State did submit evidence to establish that Jacobson had at least carried and fired a weapon. *Id.* at ¶¶ 8.

Jacobson appealed on several grounds that are not relevant to this case, but the Wisconsin Court of Appeals affirmed his conviction. *Id.* The Wisconsin Supreme Court denied his petition for review, and it does not appear that Jacobson petitioned for certiorari before the United States Supreme Court. *State v. Jacobson*, 2004 WI 123, 687 N.W.2d 523, 275 Wis. 2d 296.

1.4  Petitioner's Current Habeas Petition

This brings us to the habeas petition currently before the Court. The petitioner filed a petition for a writ of habeas corpus on July 25, 2014. (Docket #1). In it, he asserts two separate grounds for habeas relief.

In the first, the petitioner argues that "[n]ewly discovered evidence requires new trial and resentencing." (Docket #1 at 6). He provides the following further detail:

> The state argued to the jury that the petitioner personally fired a shotgun at Deputy Justice [the deputy who had moved to the back of the house], and was liable for his younger brother allegedly firing towards (2) other deputies while an unknown third party fled without discharging a firearm.
>
> After his conviction new evidence came to light in the form of (2) witnesses. The petitioner's brother made a confidential statement to the A.D.A. and the detectives that Robert Jacobson was the third party and had recently confessed that he was the one who fired the shotgun at Dep. Justice, he further denied the existence of any plan or conspiracy and provided evidence to the contrary along with material impeachment evidence against the neighbor who called 911 and alleged that William [the petitioner] called her and threatened the deputies. Jacobson also confessed to another inmate that he shot at Deputy Justice.
>
> The petitioner just received evidence establishing the above and is currently seeking representation to file a motion for post-conviction relief, pursuant to Wis. Stat. sec. 974.06.

(Docket #1 at 6–7).

The petitioner's second ground for relief is that the prosecutor withheld *Brady* evidence from him. (Docket #1 at 7). Specifically, the petitioner alleges that the prosecutor failed to disclose: (1) video-recorded statements of his brother, Alvin (in which Alvin, presumably, stated that

Jacobson fired a shot); and (2) the statement of John Czaplicki, the inmate who testified that Jacobson had admitted to firing a shot. (Docket #1 at 7–8). In describing the nature of this claim, the petitioner also argues that "[t]he state was successful in obtaining a conviction against Jacobson for the exact same conduct in which it convicted the petitioner yet never disclosed the exculpatory evidence to the defense."

The petitioner appears to realize that both of these claims are likely time-barred, because he provides information about their recent discovery. (Docket #1 at 6–8). He notes that he "does not have a relationship with his brother," and only realized that these claims may exist "[a]fter receiving hearsay information that the above evidence existed." (Docket #1 at 7–8).

After learning of the evidence, the petitioner asked the sheriff for copies of Alvin's and Czaplicki's statements, but the sheriff did not have such documents. He received no response from the prosecutor. Thus, he states that he has ordered the transcripts for Jacobson's trial; however, he has also had difficulty receiving those documents.

Finally, the Court notes that the petitioner filed a motion for a stay and abeyance at the same time he filed his petition. (Docket #2). The petitioner has not exhausted his grounds in the state courts, and so he requests that the Court grant a stay and abeyance in this case to allow him to do so. (*See, e.g.*, Docket #1 at 6–8; Docket #2).

Before taking any action on that motion or on the petition, the Court believed that further information would be necessary from the petitioner regarding the newly discovered evidence. It, therefore, requested that the petitioner file a statement to clarify the nature of that evidence. (Docket #7). The petitioner filed that statement on November 26, 2014. (Docket #10). It does not clarify much. The petitioner states:

> Weso did not learn of the newly discovered evidence until December 2013, or January or February of this year [2014] from family members familiar with Weso's case, however, Weso did not know that the information constitutes evidence that could provide relief from the conviction until shortly before Weso filed his petition on July 25, 2014, with the assistance of another inmate.
>
> The newly discovered evidence impacts Weso's claims because it demonstrates that the State used two inconsistent theories between Weso's case and a codefendant's case, including but not limited the State's opening statement, evidence, closing argument, sentencing statements to the judge, etc.
>
> Weso is still currently attempting to secure the transcripts from the Clerk of Circuit Court's Office to prove the claims in his pending petition, however, he is having difficulty in locating the court reporter.
>
> Weso believes that he will be able to secure the material in time to meet his burden of proof and also believes that said evidence constitutes strong grounds to support a motion for a new trial, and at minimum, resentencing.
>
> Wherefore, Weso respectfully submits this statement in support of demonstrating diligence and good cause.

(Docket #11, ¶¶ 1–4).

2.  DISCUSSION

With that background in place, the Court now turns to screening the petition.

Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts authorizes a district court to conduct an initial screening of habeas corpus petitions and to dismiss a petition summarily where "it plainly appears from the face of the petition…that the petitioner is not entitled to relief." This rule provides the district court the power to dismiss both those

petitions that do not state a claim upon which relief may be granted and those petitions that are factually frivolous. *See Small v. Endicott*, 998 F.2d 411, 414 (7th Cir. 1993). Upon an initial Rule 4 review of habeas petitions, the court will analyze whether the petitioner has avoided statute of limitations bars, exhausted available state remedies, avoided procedural default, and set forth cognizable constitutional or federal law claims.

### 2.1 Timeliness

The court begins its Rule 4 review by examining the timeliness of the petition. The general timeliness rules are set forth in 28 U.S.C. § 2244(d), and the Court begins by discussing the fact that the petition is not timely under that statutory rule. Concluding that the petition is untimely under the statutory rule, the Court then goes on to discuss several exceptions to that rule, which do not excuse the petition's untimeliness.

#### 2.1.1 Statutory Timeliness

A state prisoner in custody pursuant to a state court judgment has one year from the date "the judgment became final" to seek federal habeas relief. 28 U.S.C. § 2244(d)(1)(A). A judgment becomes final within the meaning of § 2244(d)(1)(A) when all direct appeals in the state courts are concluded followed by either the completion or denial of certiorari proceedings in the U.S. Supreme Court, or if certiorari is not sought, at the expiration of the 90 days allowed for filing for certiorari. *See Ray v. Clements*, 700 F.3d 993, 1003 (citing *Anderson v. Litscher*, 281 F.3d 672, 675 (7th Cir. 2002)).

Here, it appears that the petition is untimely under 28 U.S.C. § 2244(d)(1)(A). According to the information provided in his federal habeas petition, the petitioner's conviction became final on April 14, 2003, which was 90 days after the Wisconsin Supreme Court denied the petition for review, because the petitioner did not file a petition for a writ of certiorari with the

United States Supreme Court. (Docket #1 at 3). Under this formulation, the petition would have been due in April of 2004, making the petitioner's filing in this case more than 10 years outside of the limitations period.

That is not the end of the analysis, though; 28 U.S.C. § 2244(d) has several exceptions to the standard 1-year limitations period. Only one of those provisions could possibly apply in this case: 28 U.S.C. § 2244(d)(1)(D)'s directive that the 1-year limitations period begins to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."[5]

However, even applying the later start date under 28 U.S.C. § 2244(d)(1)(D), the Court must conclude that the petition is untimely. Under 28 U.S.C. § 2244(d)(1)(D), the 1-year limitations period begins to accrue "when the factual predicate 'could have been discovered through the exercise of due diligence,' not when it was actually discovered by a given prisoner." *Owens v. Body*, 235 F.3d 356, 359 (7th Cir. 2001) (quoting 28 U.S.C. § 2244(d)(1)(D).

Key to the timeliness determination in this case is the phrase "could have been discovered through the exercise of due diligence." Simply put, the petitioner—through the exercise of due diligence—could have discovered the factual predicate a very long time ago.

It is entirely irrelevant that the petitioner did not become aware of this factual predicate until more recently, as he alleges in his supplemental statement. (Docket #11). That is because the Court is concerned only with the

---

[5]The later start dates under 28 U.S.C. §§ 2244(d)(1)(B) and (C) do not apply because the petitioner does not assert that there was a state-imposed impediment or the development of new case law. 28 U.S.C. § 2244(d)(2)'s tolling provisions do not apply because the petitioner does not indicate that he engaged in any post-conviction or other collateral proceedings. (Docket #1 at 4–5).

time at which the factual predicate "could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Thus, Courts have found that the limitations period starts to run under 28 U.S.C. § 2244(d)(1)(D) even where the petitioner has not received a state's files that would form the factual predicate of his claim; because those files were public records and *could have been* requested long before, the limitations period started on the date of their availability, rather than the date of their disclosure. *See, e.g., Clifton v. Sec'y, Dep't of Corr.*, No. 10-CV-539, 2012 WL 3670264, at *4 (M.D. Fla. Aug. 27, 2012) (citing *Owens*, 235 F.3d at 359; *Heard v. Cain*, No. 06–CV-3207, 2007 WL 763691 at *3 (E.D.La. Mar.9, 2007)).

This case presents entirely the same issue. In alleging newly discovered evidence, the petitioner refers to: the changed statement of his brother; the new testimony from Czaplicki; and the resulting fact that the State of Wisconsin used an (allegedly) inconsistent theory to convict Jacobson. But, at the very latest, all of that evidence was a matter of public record in May of 2004, when the Wisconsin Court of Appeals issued the above-cited decision in Jacobson's case (if not long before, when Jacobson was indicted or tried on the basis of the petitioner's brother's changed statement). That Wisconsin Court of Appeals decision clearly lays out each piece of information that the petitioner now alleges is newly-discovered. Moreover, it is a readily-available public document. The petitioner could have—and should have—been able to locate that document immediately after its issuance in May of 2004.

Thus, at the very latest, the 1-year limitations period expired in May of 2005, even applying 28 U.S.C. § 2244(d)(1)(D)'s later starting date. But—as is the case with all things habeas-related—there are yet more exceptions to that finding of untimeliness.

### 2.1.2 *McQuiggin v. Perkins* Actual Innocence

The first of those additional exceptions is the actual-innocence rule annunciated in *McQuiggin v. Perkins*, --- U.S. ----, 133 S.Ct. 1924 (2013). In *McQuiggin*, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass…[to excuse] the expiration of the statute of limitations." *Id.* at 1928.

To determine whether the petitioner may be entitled to this exception, the Court must first determine whether he actually raised an actual innocence claim in his petition. *See, e.g.*, *Awon v. United States*, 308 F.3d 133, 143 (1st Cir. 2002). While the petitioner may never use the precise wording of "actual innocence," he may be alleging that he was convicted of a crime that he could not have committed, assuming that another person fired a shot. (*See* Docket #1 at 6–8). The Court will construe his petition liberally, since he is appearing *pro se*, *Ward v. Jenkins*, 613 F.3d 692, 697 (2010), and assume that he is making such an argument.

Next, the Court must decide whether the petitioner offers "new evidence" that would be sufficient to make a credible claim for actual innocence; he does not. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995) (claim of actual innocence "requires a petitioner to support his allegations of constitutional error with new reliable evidence."). The Court assumes that the evidence is "new," because it was not available at the time of trial. But the evidence does not support a "credible" claim for actual innocence, which requires a showing that "it is more likely than not that no reasonable juror would have convicted him," in light of the evidence. *See, e.g., id.*; *McQuiggin*, 133 S.Ct. at 1927. In fact, the Wisconsin Court of Appeals implicitly addressed this issue in its consideration of the petitioner's appeal, essentially cutting the petitioner off at the pass: the Wisconsin Court of Appeals noted that the

petitioner was charged as a party to the crime, meaning that the jury's verdict of guilty was supported by sufficient evidence, regardless of the petitioner's actual role in the shooting. *See Weso*, 2002 WI 292 at ¶¶ 17–19. It was ultimately "irrelevant whether Weso actually fired any shots." *Id.* at ¶ 19. So, even with this new evidence—which, at the very best for the petitioner, would establish only that he did not fire any shots—the petitioner would not be *innocent* of the party-to-a-crime charges of which he was found guilty. Rather, just as the Wisconsin Court of Appeals found, there would still be ample evidence by which a jury could find the petitioner guilty.

Because, even with the new evidence, the Court cannot conclude that "it is more likely than not that no reasonable juror would have convicted," the petitioner, the Court also cannot extend the benefits of the *McQuiggin* exception to timeliness to his petition.

### 2.1.3 Equitable Tolling

The final potential exception to the timeliness rules is equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). "Equitable tolling is rarely granted," and, to be entitled to it, the petitioner must establish that he was: (1) pursuing his rights diligently; and (2) prevented from filing by some extraordinary circumstance. *See, e.g.*, *Tucker v. Kingston*, 538 F.3d 732, 734 (2008) (citations omitted). Even in extremely unfortunate circumstances, equitable tolling often is not available. *See, e.g.*, *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (no equitable tolling where petition filed one day late and only shortly after attorney's father had died); *Modrowski v. Mote*, 322 F.3d 965 (7th Cir. 2003) (no equitable tolling where petition one day late as a result of attorney's incapacity).

Neither of those is the case, here. As already discussed, the Wisconsin Court of Appeals issued its decision in Jacobson's case nearly nine years

ago—and that was *after* the jury trial had occurred. There is absolutely nothing in the record that would support a finding that the petitioner was prevented from finding the evidence. Essentially, his only justification for failure to discover it is that he does not have a relationship with his brother such that he would have learned about his brother's altered testimony. But that does not change the fact that all of this evidence was available in public records. Nothing prevented the petitioner from accessing or requesting those records. Thus, the second factor is not satisfied; and, seeing as nearly a decade went by without the petitioner pursuing the evidence, it is clear that he also was not pursuing his rights diligently, and so the first factor is not satisfied, either.

Having determined that neither of the equitable estoppel factors are satisfied, and thus that equitable estoppel is not available to the petitioner, the Court is obliged to determine conclusively that the petition is untimely.

### 2.2 Substance of Petitioner's Claims

Typically, after addressing the timeliness of a petition, the Court examines whether the petitioner exhausted or procedurally defaulted the claims in the petition. In this case, the Court already knows that the claims are not exhausted—the petitioner has moved for a stay and abeyance so that he can now exhaust them. (*See* Docket #2).[6] Thus, the Court will turn immediately to what is typically the final portion of its analysis: whether the petition sets forth cognizable constitutional or federal law claims.

The petitioner listed two grounds for relief: (1) "[n]ewly discovered evidence requires new trial and resentencing"; and (2) "[t]he prosecutor

---

[6]Moreover, because the claims still have not been presented to the state courts, it would be impossible to determine whether they are procedurally defaulted.

withheld *Brady* evidence." (Docket #1 at 6–7). The first of those grounds—newly discovered evidence—is not, actually, a claim in itself.[7] Rather, it seems to be asserting either actual innocence or (together with the second ground) that the prosecutor violated his rights by presenting an inconsistent theory in a later trial. Thus, the Court believes that there are actually three claims that the petitioner may be asserting: (1) actual innocence; (2) inconsistent theory; and (3) *Brady* violation. Each of those claims is untenable.

### 2.2.1 Actual Innocence

As to the first claim, the Supreme Court has never recognized actual innocence as a cognizable, standalone habeas claim. *See, e.g.*, *Herrera v. Colins*, 506 U.S. 390, 404 (1993); *McQuiggin*, 133 S.Ct. at 1931 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). Therefore, this claim is simply non-cognizable. However, as the Court already discussed, the new evidence does not support his actual innocence, because he would still have been convicted even with the evidence.

### 2.2.2 Inconsistent Theory

As to the second claim, there is no clearly established federal law that holds that a prosecutor cannot present an inconsistent theory at a later trial. *See, e.g.*, *Bradshaw v. Stumpf*, 545 U.S. 175, 186–87 (2005) (similar to this case, where "the precise identity of the triggerman was immaterial to [the petitioner's] conviction," the prosecutor's presentation of an inconsistent

---

[7]As a matter of pure logic, the existence of new evidence, standing alone, cannot entitle a petitioner to habeas relief. In practically any case, it would be easy to deduce new evidence. The mere existence of new evidence does not establish a violation of the laws of the United States, and thus does not, itself, form the basis for habeas relief.

theory in another trial was not the basis for habeas relief); *Stumpf v. Robinson*, 722 F.3d 739, 748–751 (6th Cir. 2013), *cert. denied* 134 S.Ct. 905 (2014); *Littlejohn v. Trammell*, 704 F.3d 817, 851–854 (10th Cir. 2013). The closest that the petitioner could come to succeeding on this sort of theory would be an argument that inconsistent theories at his sentencing prejudiced him or that the state withheld materially exculpatory evidence after his sentencing. *See, e.g.*, *Bradshaw*, 545 U.S. at 186–188; *Dist. Atty's Ofc. for the Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). The petitioner does not allege either of those two sentencing-related claims—he appears to be focused on the inconsistencies with the trial—but, even if he did, those claims would be time-barred for the reasons discussed above.

### 2.2.3 *Brady* Violation

To prevail on his claim that there was a *Brady* violation, the petitioner must establish that: (1) the newly discovered evidence was favorable as either exculpatory or impeaching; (2) the government somehow suppressed the evidence; and (3) prejudice ensued as a result of its suppression. *See, e.g.*, *United States v. Kimoto*, 58 F.3d 464, 474 (7th Cir. 2009) (quoting *United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008)); *Brady v. Maryland*, 373 U.S. 83, 88 (1963). The Court will assume that the first of those factors is satisfied; even so, the other two are not. The newly discovered evidence does not appear to have been available for 14 months after the shooting incident, *see Jacobson*, 2004 WI App 125 at ¶ 7, which itself was not for at least 3 months after the petitioner's sentencing in July of 2000. Thus, the newly discovered evidence could not have been suppressed in the relevant time period because it was not even in existence. Moreover, as the Court has now reiterated several times, the newly discovered evidence would not have altered the outcome of the trial: the Wisconsin Court of Appeals concluded that there would have

been sufficient evidence to convict the petitioner even if he had not fired a single shot. *Weso*, 2002 WI App 292 at ¶ 19. Thus, even if there was suppression, it did not prejudice the petitioner. Thus, the petitioner's *Brady* violation claim is not viable.

3. CONCLUSION

For all of these reasons—that the petition is untimely and fails to raise viable claims—the Court is obliged to deny the petition for a writ of habeas corpus.

Finally, under Rule 11(a) of the Rules Governing Section 2254 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), the petitioner must make a "substantial showing of the denial of a constitutional right" by establishing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal citations omitted). While Rule 11(a) permits a district court to direct the parties to submit arguments on whether a certificate of appealability should be issued, additional arguments are not necessary here. The denial of the petition is two-fold—based upon timeliness and the merits—and both foundations are solid. No reasonable jurist would disagree with the Court's determination.

Accordingly,

IT IS ORDERED that the petitioner's petition for a writ of *habeas corpus* (Docket #1) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that a certificate of appealability as to the petitioner's petition be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED with prejudice.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of January, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge